FILED

MAY 2 0 2024

U.S. DISTRICT COURT- WVND
MARTINSBURG, WV 25401

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TIMOTHY HALL,

              Plaintiff,

vs.

EASTERN PANHANDLE ANESTHESIA
ASSOCIATES, WEST VIRGINIA UNITED
HEALTH SYSTEM [WVU-BMC]; AIR
METHODS; HEALTHNET AEROMEDICAL
SERVICES

              Defendant

CIVIL ACTION NO.

3:24 cv 61

COMPLAINT

## NATURE OF THE CASE

1. This is an action for damages based upon the intentional unlawful discriminatory and
retaliatory actions including wrongful termination of the Plaintiff's employment, and the
continued discrimination and retaliation against the Plaintiff outside of the workplace in
violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112 and
retaliation violations under the ADA, 42 U.S.C. § 12203. The Plaintiff also asserts state
statutory claims under the West Virginia Human Rights Act, W. V. Code § 5-11-13,
based upon violation by the Defendants of the prohibitions of §5-11-9. The Plaintiff also
asserts state statutory claims based upon violation under the West Virginia Patient Safety
Act, W.V. Code § 16-39-4. He also asserts a common law tort claim for wrongful
termination and seeks punitive damages for the tortious conduct.

<u>PARTIES</u>

2.  Plaintiff is an adult male individual who currently resides in Hedgesville, West Virginia. At present, the Plaintiff is a person with a "disability" within the meaning of 42 U.S.C. § 12102.

3.  Eastern Panhandle Anesthesia Associates ("EPAA")is headquartered at 2500 Hospital Drive, Martinsburg, West Virginia 25402 within the facility of West Virginia University-Berkeley Medical Center.  Defendant is a provider of anesthesia and pain management healthcare and is contracted with West Virginia University Medicine, aka, West Virginia United Health System, Inc., to provide exclusive anesthesia and pain management services within the WVU-Berkeley Medical Center and ancillary services.

4.  West Virginia University-Berkeley Medical Center ("WVU-BMC"), aka, West Virginia United Health Systems, Inc. is headquartered at 1085 Van Voorhis Road, Suite 500, Morgantown, West Virginia 26505. WVU-BMC facility is located at 2500 Hospital Drive, Martinsburg, WV 25401.  Defendant is the largest provider of healthcare services in West Virginia.  Defendant employs more than 33,000 employees at its institutes, hospitals, and ancillary service clinics. (Based upon West Virginia University Health System's 2023 Annual Report, published April 3, 2024).

5.  Air Methods is headquartered at 5500 South Quebec Street, Suite 300, Greenwood Village, CO 80111.  Air Methods is a contractor of HealthNet Aeromedical Services and thereby WVU-BMC supplying the pilots for patient flight transport services. Air Methods is also based at the Hagerstown Regional Airport, Maryland. (www.airmethods.com)

6. HealthNet Aeromedical Services is headquartered at 110 Wyoming Street, Charleston, WV 25302. HealthNet Aeromedical Services is 1/3 owned by West Virginia Medicine, aka, West Virginia United Health Systems. HealthNet Aeromedical Services has multiple base locations for service areas including 226 Pilot Way, Martinsburg, WV 25405 and is the provider of patient flight transport services for WVU-BMC. HealthNet Aeromedical Services contracts with Air Methods to supply pilots for their fleet. (see www.healthnetaeromdical.com)

7. Plaintiff was employed by Defendant EPAA as an Anesthesiologist Provider from July 2017 until his intentional unlawful discriminatory termination on February 10, 2020; however intentional unlawful discriminatory, and retaliatory actions began in August 2019 by Defendants EPAA and continued with the WVU-BMC Clinical Professorship appointment until it lapsed in July 2020 due to the intentional unlawful discriminatory, and retaliatory actions by Defendant WVU-BMC.

## JURISDICTION AND VENUE

8. Subject matter jurisdiction for the Plaintiff's disabilities discrimination federal statutory claims is proper under 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), insofar as it incorporates by reference Section 2000e-5(f)(3) of Title VII of the Civil Rights Act of 1964. The Court maintains supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

9. Venue is proper in this judicial district under 28 U.S.C. § 1391 as all of the substantial facts, events and conduct giving rise to Plaintiff's claims occurred in this District.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. The Defendants' intentional unlawful discrimination against the Plaintiff in violation of the Americans with Disabilities Act and the West Virginia Human Rights Act were timely filed as a charge of discrimination with the Equal Employment Opportunity Commission. Plaintiff's charge has been closed by letter dated February 21, 2024.

FACTUAL ALLEGATIONS

11. In May 2019, Plaintiff was threatened multiple times by a WVU-BMC employee while Plaintiff was performing patient care and transport to the ICU. Plaintiff properly reported the incident to WVU-BMC supervisors and administration. Harassment both inside and outside the workplace continued which compelled the Plaintiff to seek relief through a court protection order which was granted to the Plaintiff against said employee on July 25, 2019. Prior to the protection order hearing, the Plaintiff's legal representative in the protection order hearing specifically requested WVU-BMC Director of Strategic Partnerships in the Medical Services Office, Betsy Gambino to provide testimony and assistance in the hearing therefore, WVU-BMC had prior knowledge of the protection order and the protection order hearing date.

12. Intentional unlawful discriminatory actions commenced in August 2019 within a month of a protection order being granted to the Plaintiff by Magistrate Court against a WVU-BMC employee who repeatedly threatened the Plaintiff while the Plaintiff was performing patient care (Exhibit A) and although submitted outside of the workplace, a safety complaint made to the FAA regarding HealthNet Aeromedical Services/Air Methods flights, in which "helicopter services" personnel contacted Athony Zelenka, CEO of WVU-Berkeley Medical Center and reported that the Plaintiff had made a

complaint. Mr. Anthony Zelenka then went to Jack Shamblin, manager of Defendant EPAA and informed Jack Shamblin of the Plaintiff's protected activity which is documented in the audio recording of the conversation between Jack Shamblin, EPAA manager, and the Plaintiff on August 18, 2019 (Exhibit B ). These intentional, unlawful discriminatory actions were specifically intended to harm the Plaintiff's employment and licensure for the protected activity involved and cause intimidation for engaging in protected activity.

13. The intentional, unlawful discriminatory actions commenced with a threatening letter handed to the Plaintiff on August 26, 2019, after the Plaintiff had returned to work from a scheduled week of vacation, a) mandating an unlawful discriminatory psychiatric and psychological evaluation, b) being immediately removed from the call schedule and Medical Office Building 3[MOB3] schedule, c) 6-month probation period and change in contract terms from 120-day notice to 10-day notice, and c) if the Plaintiff did not agree to these terms be terminated immediately. (Exhibit C)

14. The Plaintiff was then given a second letter the next day, which was a slightly altered letter from the first, yet still mandating the same demands of the Plaintiff as the first letter (Exhibit D) EPAA continued the retaliatory actions against the Plaintiff.

15. Regardless of the requests from August 26, 2019, through October 11, 2019, by the Plaintiff asking for resolution, Defendant EPAA unlawfully terminated the Plaintiff's employment. Jared Adams, Plaintiff's legal counsel at that time, stated as such in the letter dated October 18, 2019, to Defendant EPAA's attorney, Brad Weiss, stating "When Dr. Hall refused to agree to submit to an evaluation by a psychiatrist or psychologist- his employment was terminated. An employer cannot require such an examination unless the

_____COMPLAINT - 5

examination is shown to be job related and consistent with business necessity. See 42

U.S.C. Section 12112(d) (4). As your client has already acknowledged, Dr. Hall provides

an excellent standard of care to his patients. Accordingly, your client terminating Dr.

Hall's employment violates federal law." (Exhibit E)

16. Further, even though the Plaintiff did not agree to these terms and Defendant EPAA

stated that the Plaintiff provided an excellent standard of care, retaliatory and

discriminatory actions were invoked on the Plaintiff by the Defendant by immediately

removing him from the call schedule and MOB3 schedule.  Only upon the Plaintiff's

legal representative questioning this action was the Plaintiff returned to the schedule in

November 2019. (Exhibit E-letter dated October 18, 2019) The required standard of

causation is evident in the Plaintiff engaging in protected activity, including opposition of

intentional unlawful discriminatory evaluations, the employers' knowledge of protected

activity, the Plaintiff suffering adverse action, and the inference that the protected activity

is a factor with timing of the adverse actions imposed as well as, Jack Shamblin, EPAA

manager stating that the Plaintiff was making too many complaints.

17. These intentional unlawful discriminatory actions were imposed less than a week after

Jack Shamblin, EPAA manager admitted to knowing about the complaints and reports

made by the Plaintiff, then CEO of WVU-BMC Anthony Zelenka being contacted by

"helicopter services", and less than month after the Plaintiff was granted a protection

order for being threatened in WVU-BMC by a WVU-BMC employee while performing

patient care. When the Plaintiff refused this unlawful discriminatory demand for

evaluation in which intentional unlawful discriminatory and retaliatory actions were

already imposed by Jack Shamblin and EPAA, and in which  Defendants could not

produce any foundation or support for imposing these intentional unlawful discriminatory demands and retaliatory actions, were unwilling after multiple attempts throughout the time period of August 2019 through October 2019 to resolve any matter, the Plaintiff was given a 120-day without cause notice of termination. (Exhibit F)

18. Even after the termination letter was given to the Plaintiff, the Plaintiff continued to request the specific complaints and resolution of any issues involving the Plaintiff which Defendants EPAA and WVU-BMC denied any existed, refused to produce any complaints, and refused the Plaintiff's requests for resolution. It was only when Defendant EPAA was required to respond to an OSHA complaint dated October 20, 2020, did any complaints regarding the Plaintiff be revealed.  These complaints have still not been substantiated, were by Defendant EPAA's own admission regarded as hearsay, and were never brought to the Plaintiff for proper resolution.  In fact, the Plaintiff through legal counsel and subsequent credentialing processes was able to obtain his credentialing file from WVU-BMC and there is nothing adversarial listed and no complaints mentioned, again showing no substantiation for any complaints against the Plaintiff because these actions taken by Defendants EPAA and WVU-BMC were in retaliation for the Plaintiff engaging in protected activity.

19. Defendant EPAA's attorney continues to falsely claim a non-renewal of the employment contract. The Plaintiff's contract had already renewed for another year on July 1, 2019, as that was the contract renewal date and Jack Shamblin, manager of EPAA, and the Plaintiff had multiple conversation regarding the Plaintiff's admittance as partner to EPAA since the Plaintiff had fulfilled the required 2 years of employment for this partnership admittance at the July 1, 2019, renewal date. In fact, Jack Shamblin stated to

the Plaintiff that typically admittance as a partner would begin at the end of the calendar

year which shows there was no intention of not renewing the Plaintiff's contract but

further employment and admittance to the partnership. The events between August 2019

through October 2019 have continued to be omitted and drastically misrepresented by

Mr. Weiss, Defendant EPAA Manager Jack Shamblin's sworn affidavit and Defendant

EPAA's  response to the OSHA case investigators in which the Defendants deny

knowing any of the events from August 2019 through October 2019 occurred and of any

of the Plaintiff's protected activity.

20. Defendant WVU-BMC denies the same and then engages in intentional unlawful

discriminatory actions against the Plaintiff  by trying to constructively dismiss the

Complainant's Clinical Professorship and active credentialing through a false narrative of

lack of malpractice insurance. The Plaintiff still  maintained an appointment of Clinical

Professorship directly with WVU-Berkeley Medical Center. Maintaining staff privileges

requires malpractice insurance coverage which was provided through West Virginia

Board of Insurance and Risk Management per the Appointment letter dated July 1, 2019.

(Exhibit G)

Defendant WVU-BMC has submitted contradictory statements regarding the Plaintiff

employment status with WVU-BMC.  In July 2018 WVU-BMC granted the Plaintiff a

Clinical Professorship appointment which renewed annually with the added benefit of

malpractice insurance as stated on the Plaintiff's appointment letter. This appointment

existed and was not dependent on the employment status of the Plaintiff with EPAA, was

active and along with the Plaintiff's active credentials with WVU-BMC remained intact

after the Plaintiff's unlawful discriminatory termination with EPAA.

21. Subsequent to Defendant EPAA's intentional unlawful discriminatory actions against the Plaintiff with contract changes and evaluation demands with no due process or basis and then being terminated without cause by Defendant EPAA, the Plaintiff received a letter by WVU-BMC Medical Staff Affairs, signed by Henry Kuban M.D. stating that in order to maintain credentials with WVU-Berkeley Medical Center the Plaintiff would need to send them proof of medical malpractice insurance coverage. This letter was postdated and postmarked/mailed February 17, 2020, which is the same date the credentials would be terminated if proof was not given. The Plaintiff did not receive the letter until February 20, 2020, since it was not mailed until after the due date so that the Plaintiff would not have time to provide proof.  The Plaintiff immediately called Dr. Kuban to address this issue and was told that as long as the Plaintiff sent Samantha Colbert, Medical Staff Coordinator, the proof of insurance there was nothing more they would need, and Plaintiff's credentialing would be maintained. Since malpractice through the Clinical Professorship was on file already the proof of insurance was never needed, and the Plaintiff's credentials should have been maintained. Again, malpractice insurance was on file under the Clinical Professorship already. (Exhibit H)

22. The Plaintiff had requested his credentialing file throughout this time period and any employee files to ensure that his file did not contain any erroneous information which was also delayed due to the pandemic closures. Once the Plaintiff received the file at the end of April 2020, it did not show any adverse information. However, after sending the Medical Staff Secretary additional malpractice information, since WVU-BMC already had active malpractice insurance on file for the Plaintiff, he received emails that the Credentialing Committee and Medical Executive Committee would have to meet to

approve his credentialing status. Since the Plaintiff's credentials were active and the Plaintiff was only requesting a date when he could retrieve his badge, these actions, at best, were extreme. However, these actions were assured to the Plaintiff as a formality, and everything looked fine for his credentials to remain active. These actions were directly against what Dr. Kurban had assured in February 2020, however, their assurances as to this being formality prevented the Plaintiff from taking any further action. On June 30, 2020, the Plaintiff received a letter stating that the Medical Executive Committee, in which members on this committee are also partners of Defendant EPAA, decided the Plaintiff would need to go through an FPPE evaluation process to "re-instate" his credentials and the letter stated this decision was to be put in his credentialing file (Exhibit I). This is not normal procedure for credentialing, did not follow their own policies and procedures for such an action, and is not done across the board for all staff making this continued intentional unlawful discrimination against the Plaintiff. There was no indication of any adverse issues with the Plaintiff's practice or in his credentialing file which he received before this action.

23. Defendant WVU-BMC also, decided without the Plaintiff's consent or request to classify this falsely induced lapse as a leave of absence. The Plaintiff never requested a leave of absence, there is no documentation of any leave of absence paperwork which would need to be signed by employer/employee with any agreed upon beginning and ending dates and stipulations of the leave as well as, outline a valid reason for a leave of absence. If this was merely a leave of absence, then why would WVU-BMC send the February 17, 2020, letter stating a lapse in malpractice insurance would terminate credentialing status with WVU-BMC and why would there need to be any need for a meeting by the

Credentialing Committee or Medical Executive Committee for review?  If it was a leave of absence, then being required to undergo an FPPE upon a return from a leave of absence without substantiation, notice, or agreed upon stipulations which a leave of absence would require constitutes another violation under EEOC and ADA statutes for intentional unlawful discrimination and OSHA for the whistleblower retaliation. A leave of absence would violate employment laws for summarily classifying an employee under a leave of absence without proper documentation and paperwork. (Exhibit J)

24. The Plaintiff attempted to inquire as to the basis for this decision and on June 30, 2020, was finally told that there were complaints from staff which were subsequently created by an HR review initiated concurrently with the Plaintiff's departure. In this email communication, Garland Nagy, WVU-BMC attorney, refers to the Plaintiff's intentional unlawful discriminatory termination as a resignation which is false and states that the hospital universally decided to treat this as  a leave of absence which is in violation of employment laws, their own Medical Staff By-Laws, procedures, and protocols, etc. (Exhibit J).

25. Garland Nagy's list of complaints is fabricated, have never been substantiated, never followed any of Defendant WVU-BMC's protocols or procedures for complaint processes and the Plaintiff has never been given these complaints for rebuttal, recourse, or resolution and then demanded these actions of the Plaintiff under a further fabricated "re-credentialing" issue. Defendant WVU-BMC claims that the Plaintiff was not an employee and Anthony Zelenka, then CEO of WVU-BMC states in the recorded conversation with the Plaintiff on February 5, 2020, that Defendant WVU-BMC has no issues with the Plaintiff and that it was between Jack Shamblin and the Plaintiff, (see

Exhibit B) yet now there was a subsequently created, concurrent human resources review done.

26. Defendant WVU-BMC also claims that they decided the Plaintiff was on a leave of absence. If the Plaintiff is not an employee why would human resources be involved and initiating a subsequently created concurrent review? If this is what WVU-BMC claims is a leave of absence, where is all of the paperwork outlining this leave of absence and if it was just a leave of absence then what exactly is a subsequently created, concurrent review, why would it be necessary, what protocols, procedures and rebuttal processes govern such a review and what recourse processes are afforded to the Plaintiff under review when the employee being reviewed is not physically present during the review to defend, rebut or correct any issues? Nothing has been listed or mentioned in multiple credentialing processes for subsequent opportunities which means there are no adverse issues with the Plaintiff and this "subsequently created, concurrent review" and "leave of absence" are false statements showing continued intentional unlawful discriminatory actions taken against the Plaintiff. Upon further inquiry, among the complaints which were listed, one had to do with the helicopter safety inquiry the Plaintiff made, which is the second time the Defendants have used this protected activity, safety inquiry to retaliate against the Plaintiff of which they also deny knowledge. These complaints were of the same nature as the unsubstantiated complaints Defendant EPAA refused to produce evidence of yet invoked intentional unlawful discriminatory demands of the Plaintiff, all leading to the Plaintiff's unlawful termination in February 2020. Also, in the transcript of the recordings documenting the conversations with Jack Shamblin on August 18, 2019, and Anthony Zelenka, on February 5, 2020, gives proof that the Plaintiff did not speak of

any flights or FAA complaints which were made exclusively outside of the workplace, EPAA, and WVU-BMC, since in the recording, Jack Shamblin stated that helicopter services told Tony ( see Exhibit B).

27. Defendant WVU-BMC using unsubstantiated complaints again shows continued conspiratorial unlawful discrimination and retaliation against the Plaintiff. The Defendants did not adhere to Medical Staff bylaws regarding the complaint process which states complaints are to be addressed immediately which to date have not been substantiated, made false statements about the nature of WVU-BMC's actions regarding the Plaintiff's credentialing and employment status, and threatened the Plaintiff with adverse reporting. By this point, the Plaintiff had already received a credentialing packet in April 2020 stating nothing adverse in his credentialing file or with his practice. The Plaintiff's last day in the WVU-BMC facility was February 8, 2020. Now, in July 2020, WVU-BMC stated they initiated an HR review concurrent with his last day, which was February 8, 2020, yet nothing was in his credentialing file in April 2020. This proves the complaints were not concurrent with the February 8, 2020, departure and in reality, were mentioned in June 2020 in retaliation for trying to retrieve his badge and ensure his credentials remained active. The Plaintiff had not physically worked in that facility since February 2020 making it impossible for new complaints to be filed. Also, the Plaintiff was warned if he did not comply with these unlawful discriminatory demands he would be reported to the National Practitioner Database, once again showing retaliation against the Plaintiff without being allowed any due process according to medical staff by-laws. However, WVU-BMC never reported anything showing intentional misuse of the National Practitioner Database to intimidate the Plaintiff. These intentional unlawful

discriminatory and retaliatory actions by the Defendants were imposed on the Plaintiff to harm his licensure, livelihood, and reputation for making, in good faith, patient safety, personal safety, flight safety complaints, and opposing intentional unlawful discriminatory evaluations which is protected activity.

28. Plaintiff filed a timely EEOC complaint received by the EEOC on August 31, 2020. On September 8, 2020, Defendant EPAA breached the Plaintiff's retirement account, changing contact details and two-step authentication methods to that of Jack Shamblin and EPAA effectively locking the Plaintiff out of his account. After unsuccessful attempts to speak with Defendant EPAA's third-party fiduciaries, the Plaintiff filed a complaint with the Department of Labor: Employee Benefits Security Administration. Rob Hoxton and Ted Reeder were the financial advisors for Jack Shamblin, MD, and Eastern Panhandle Anesthesia Associates' [EPAA] retirement account at the time the Plaintiff was employed by Defendants EPAA/WVU-Berkeley Medical Center. The Plaintiff's retirement account through Fidelity managed by Hoxton/Reeder was breached and the Plaintiff was locked out of entirely in September 2020. To date, the Plaintiff has been made aware through FOIA requests that during the ERISA questioning of Rob Hoxton, Fidelity Investments possesses an audio recording of the phone call in which the individual called in to gain access to the Plaintiff's account. Fidelity states that they will not release this audio to the Plaintiff without a subpoena. This audio recording and phone records would identify the individual making the phone call which is wire fraud. The Berkeley County court case to obtain the subpoena detailed below was obstructed by county officials in their official capacity, who are relatives of WVU-BMC employees who took part in the intentional unlawful discriminatory and retaliatory actions against

the Plaintiff, showing public corruption and political interference.  Fidelity Investments, Inc. has refused to release to the Plaintiff the records and recordings for the day of the breach even though, a court ordered subpoena was issued and served. The FOIA documents show that the intentional unlawful discriminatory and retaliatory termination of the Plaintiff's employment was misrepresented at best and further character discreditation by the Defendant EPAA and their third-party fiduciaries were omitted from the Plaintiff for rebuttal during the investigation. The investigation of the breach of the Plaintiff's retirement account is pending.

a) In trying to file court documents to obtain the subpoena from Fidelity Investments for the audio recordings of a breach of the Plaintiff retirement account on September 8, 2020; which has been withheld from me since 2020 even though it is the Plaintiff's account; the filing documents were tampered with at the local circuit court in Berkeley County, WV. These documents which were mailed USPS certified, return receipt requested to Berkeley County Circuit Court, were signed for by a court employee, Sharon Borden and then subsequently opened, re-taped closed and returned to sender fraudulently in violation of West Virginia Code § 61-5-22. This was reported to the FBI, and I have not received a follow-up to date even after multiple requests. This was also reported to the County Prosecuting Attorney Catie Wilkes-Delligatti for investigation, however there are conflicts of interest with individuals who are related and hold positions within the court, prosecuting attorney's office and those involved with the cases including Kevin Miller Berkley County Prosecuting Attorney investigator with Carol Miller, his wife and Court Administrator; Michelle Schoppert, Berkeley County Circuit Clerk and Kevin Miller's relative; former Magistrate Snow's daughter, Hope Kingery is a registered nurse with

WVU-BMC and relatives of Kevin Miller, as well as the Dunham family members including Joshua Dunham-OR nurse who took part in these unlawful intentional discriminatory and retaliatory actions against the Plaintiff. The Plaintiff does not believe a formal unbiased investigation would be attainable and has not received an answer as to who tampered with the mail and obstructed the filing of the case documents.

In obtaining FOIA records for the mail tampering incident above, it has been discovered that the Circuit Court clerk Shelly Schoppert, Judge Faircloth's clerk, Belinda Parsons, and Berkeley County Prosecutor Office investigator, Kevin Miller, met and discussed the incident on May 30, 2023.  It is stated that Belinda Parsons knew about the reasons behind the mail incident and covers Judge Faircloth's courtroom.  This paperwork was to file a new court case, had not been assigned to any Judge and had nothing to do with Judge Faircloth.

The Plaintiff was originally told by Kevin Miller, the investigator, that the paperwork was filled out incorrectly and the Plaintiff should hire an attorney to file cases. This is also false and a purposeful deflection away from the obstruction which occurred because the subsequent paperwork sent to the courthouse which was processed was an exact duplication of the original in question.  It had nothing to do with the paperwork. Kevin Miller never mentioned his meeting or what Belinda Parsons "knew" and why the case had been obstructed. Catie Delligatti, the Berkeley County Prosecuting Attorney has not responded to these issues or addressed the obstruction of court cases fraudulently in violation of West Virginia Code § 61-5-22, under her jurisdiction.

After months of trying to file the court case to obtain a subpoena for the Fidelity records, the Plaintiff was finally granted a subpoena however, Shelly Schoppert stated in a letter

that NO active court case was filed,  no active case number assigned and just gave the

Plaintiff the signed and stamped subpoena document.  When Fidelity Investments refused

to comply with the subpoena and the Plaintiff filed a Motion to Compel, the court clerk

assigned it the same number as a totally different case.  Judge Redding denied the Motion

to Compel, and the Plaintiff has no way of appealing it since it did not have an assigned

court case and it is not a final motion per the Intermediate Court of Appeals of WV.

(Exhibit K)

29.    The Plaintiff and his family members, through "associational discrimination" continue to

endure retaliation and harassment inside the workplace with subsequent employment

through known affiliated personnel of Defendants and outside of the workplace in the

community at large also through known affiliated personnel and third parties of

Defendants. Retaliation outside the workplace has been shown through Burlington

Northern court cases of employment retaliation extending to subsequent employment and

the community at large through affiliated individuals and businesses. "EEO statutes

prohibit employers retaliating against employees and applicants for employment because

of their "protected activity" including, "-opposing an employer's unlawful discrimination

under the EEO statutes or participating in an investigation, hearing, or proceeding under

the EEO statutes." The EEO further states the "retaliatory conduct is characterized as

'retaliatory harassment.' The threshold for establishing unlawful retaliatory harassment is

different than that for a discriminatory hostile work environment. As the Supreme Court

explained in *Burlington Northern & Santa Fe Railway Co. v. White,* the EEO laws'

antiretaliation provisions complement their antidiscrimination provisions but protect

against a broader range of behaviors-they forbid anything that might deter a reasonable

person from engaging in protected activity." The EEO further details that "EEO laws also cover 'associational discrimination.' This includes harassment because the complainant associates with someone...." (See EEOC Enforcement Guidance on Retaliation and Related Issues, August 25, 2016, 915.004, Title VII, EPA, ADEA, Rehabilitation Act, ADA, GINA, 29 CFR Part1601, 29 CFR Part 1603, 29 CFR Part 1614, 29 CFR Part 1620, 29 CFR Part 1625, 29 CFR Part 1626, 29 CFR Part 1630,29 CFR Part 1635)

30. The following are examples of retaliatory harassment as well as, associational discrimination endured by the Plaintiff and his family members. These include but are not limited to:

31. Civil cases were filed in Berkeley County Circuit Court involving individuals in the retaliatory actions of harassment and stalking in the community. In this circuit court case, three Steptoe & Johnson law firm attorneys represented the defendants including Steptoe & Johnson attorney-former Northern District of WV US Attorney William Powell. Further, letters seeking investigation of these incidents were sent to William Powell during his administration in the Northern District of WV US Attorneys Office. It is highly questionable that once a civil suit is filed, that former Northern District of WV US Attorney William Powell and President of Steptoe & Johnson law firm, Ken Barton, represented a defendant Scott Ford in this case, as well as Tracey Eberling of Steptoe & Johnson who represented another defendant, Justin Schooley.

32. The Plaintiff was harassed by an individual in a grey Jeep Wrangler Maryland tag ▮▮▮▮▮▮, driving aggressively to the Plaintiff on Rt. 9 Hedgesville Rd, then entering the Plaintiff's development (Neilland Park, Martinsburg). The aggressive driving continued in the development where the driver made a sharp U-turn and left. Of note, there is only

one entrance into and out of the development. This vehicle is owned by Cornerstone Wealth Management, Scott Ford.

34.    The next incident with Mr. Ford was when he appeared at the Plaintiff brother-in-law's house during a family cookout. During this event he approached the Plaintiff and made numerous statements to both the Plaintiff and the Plaintiff's wife about where they lived and the property which they just bought. Mr. Ford also asked the Plaintiff about trespassers on the Plaintiff's property and if he ever was threatened on the Plaintiff's property. These statements and questions were indicative of events which happened to the Plaintiff and the Plaintiff's family. Soon after these statements Mr. Ford left.

35.    The Plaintiff had to obtain other employment after this intentional unlawful discriminatory termination and while working in Covington, VA, in May 2021, the Plaintiff was nearly run down in the hospital parking lot by Abby Via, who was an employee at the hospital and has connections with local law enforcement, emergency management services, HealthNet Aeromedical Services, Air Methods, etc. and who connected back to individuals involved in the EEOC/ADA/Federal OSHA case originating in West Virginia. The local Sheriff's Department was made aware of this incident and did not properly investigate it, even though the Plaintiff requested a sheriff deputy to come meet with him that evening. The Plaintiff made several requests of the local Sheriff's Office to investigate this matter. The Plaintiff was told it was a private parking lot and they would not investigate the matter.

The Plaintiff reported this incident to the Nursing Manager and Chief Safety Officer, Christine Martin-G4S/Allied Security. Christine Martin wrote up a report however, no appropriate action was taken by the individuals involved according to any policies and

procedures in place. [ hospital policy #IP.PS.002: Theft and Violence in the Workplace] I also reported this incident to head of security John Taylor, G4S/Allied Security, and asked that the video footage be preserved. Security did not preserve the video. However, the Plaintiff has an audio recording of the review of the video footage with Christine Martin.

The Security department along with various employee representatives of the hospital have daily, weekly, and monthly meetings regarding safety concerns within the hospital and have policies and protocols in place to handle these concerns. They did not follow any of these policies or protocols in this incident and have actively concealed the matter. The Plaintiff also reported this incident that evening to the local Sheriff's Deputy since their office has a presence at this hospital. Nothing was investigated or followed-up on properly after repeated attempts to speak to the local sheriff's office and the deputy on duty that evening. (Exhibit L)

36.    Within 2 months of this complaint, the Plaintiff received a "without cause" discharge after repeated, unsolicited comments about OSHA safety by colleagues, including Dr. Matthew Fulton of Valley Anesthesia Associates.

After this incident, during routine patient care, the Plaintiff requested a plan of care that would allow a patient to proceed to surgery in a safe manner. When certain medications in this plan of care were requested to be available but not used, a complaint against the Plaintiff's request of these medications was submitted to Hospital administration and supervisors yet was not submitted to the Plaintiff causing hostile work environment for the Plaintiff. The Plaintiff made a safety complaint which was not addressed according to policies and protocols and even though, the Plaintiff was following standard practice of

care for a patient to proceed safely to surgery, a complaint was submitted throughout hospital administration and reviewed immediately; yet the Plaintiff's complaint about safety has never been addressed.

37.    Outside of the workplace, the Plaintiff appropriately reported to the West Virginia State Police a stalking and harassment incident for investigation. On 04/30/2021, between 11:00 -12:30, the Plaintiff wife and the Plaintiff daughters were shopping in TJ MAXX, 198 Retail Commons Pkwy, Martinsburg WV 25403. While shopping, they noticed a man following them throughout different areas of the store. The Plaintiff 's wife kept an eye on where he was as she had children with her, and it was making them uncomfortable. They went to the checkout counter and were being helped at the checkout. The Plaintiff's wife saw this same man stand directly across from this checkout but in sight of her and her children the entire time they were in the checkout process. As they finished and were leaving, he grabbed an item and left that area. This entire incident made the Plaintiff's wife feel threatened, so after getting into their vehicle, she documented the incident and obtained his license plate when she saw what vehicle he got into because He came out of the store within minutes of them without purchasing anything. He then walked in front of their vehicle, noticed they were still in it and got into the burgundy Ford F-150 shown in the pictures provided. After noting the Maryland tag number ██████, they left. The Plaintiff has a dashcam and reviewed the camera footage from this time period. The man came into the store after they did however, after reviewing the film there is a blue Mazda CX-5, ██████ also with Maryland tags drives by him as he is walking towards the store. He then immediately turns around and walks back to his vehicle then the blue Mazda stops, and the person makes contact with

him as he gets back to his truck. She goes past and he then comes into the TJ MAXX store. This same vehicle then makes another pass before this man gets into his vehicle and exits the parking lot.

This incident was reported to WV State Police and is still ongoing as none of the individuals involved will call Sgt. Nine, WVSP, back. The Plaintiff has been able to ascertain that the male in the burgundy Ford F-150 with MD tags ▮▮▮▮▮ is a Maryland DOT employee. The blue Mazda is registered to the Dillard family who has affiliations through the Greater Hagerstown Committee whose members include Scott Ford, Cornerstone Wealth, Rob Hoxton, EPAA's fiduciary.

38.     Within the same time frame as the stalking incident reported which was April 2021 at TJMaxx, a plainclothes Loudoun County Sheriff Deputy-John Giangola was documented stalking the Plaintiff's wife and children. This Loudoun County Deputy, former Berkeley County Sheriff Deputy, was crossing state lines in violation of our Federal Civil rights following the Plaintiff's wife and children into a 5 Below Store in Martinsburg, WV, watching them check out and leaving immediately after they left the store not having purchasing anything. Subsequent to this incident it has become known that this Loudoun County Sheriff Deputy has been re-employed by the Berkeley County Sheriff's Office as a criminal investigator.

39.     Between June 2020 and the present, the Plaintiff's children and Plaintiff have been subjected to 4 traffic stops for no reason by Berkeley County Sheriff's Office deputies; 3 traffic stops by the West Virginia State Police; and 3 traffic stops by Virginia State Police. None resulted in tickets. That is 10 traffic stops in vehicles registered to the Plaintiff for no lawful reason.

40. The following are incidences which occurred at a local church, Independent Bible Church [IBC], involving church and youth group leaders, deacons, and board members. The incident was reported to the pastor, and appropriate agencies.

On 05/19/21, the Plaintiff's wife was called by the Plaintiff daughter to come to the church because she was upset that she had been singled out inappropriately. However unbeknownst to the Plaintiff and his wife, this was not the first time this happened and was found out to be a pattern and practice of harassment to the Plaintiff's daughter from leadership in this church. When the Plaintiff 's wife got to the church and spoke to the two leaders, Melissa Dawson and Julie Jones, they told her that there had been other complaints by members of the church "for over a year" about her daughter. The Plaintiff's wife first asked why the Plaintiff or herself, the parents, had never been contacted which they did not answer. Then the Plaintiff's wife asked who was making these complaints about the Plaintiff's daughter. These two leaders said it was not for them to say, only that they have been approached several times over the last year. This statement in not coincidental due to the fact that the church has over 1000 members, yet the Plaintiff's daughter has been the topic of discussion by church leaders for over a year, the Plaintiff or his wife were never approached or contacted by leaders, and it is also no coincidence that this timeframe coincides with the Plaintiff's intentional unlawful, discriminatory termination at WVU-Berkeley Medical Center. To this day, Independent Bible Church leaders refuse to release the name of the individual who was making these complaints and harassing the Plaintiff daughter during this time. It is also known that WVU-BMC employees including but not limited to, Joshua Dunham, OR nurse, who were involved in the intentional unlawful discrimination and retaliation attend

this church and have family members who are employed by IBC as well as members employed in key positions within county agencies, such as the courthouse, law enforcement agencies, and local businesses, which have facilitated continued retaliation outside the workplace, obstruction and denial of due process in civil proceedings and harassment. It is also known that IBC members hold WVU-BMC administrative positions.

41.    Kevin Miller, the Berkeley County Prosecutor's investigator, attends this church with his family and extended family members. Kevin Miller is related to Shelley Schoppert, the Berkeley County Circuit Court clerk and his wife Carol Miller is the Berkeley County Court administrator.  Kevin Miller has knowledge of all of the Plaintiff court cases and each has been obstructed to protect those involved including these church members. Shelley Schoppert, Brenda Parsons, and Carol Miller were listed in the FOIA about the Fidelity subpoena obstruction of mail and filing documents in which the court case for the IBC subpoena was listed. Kevin Miller should not have any knowledge of the IBC subpoena case and had nothing to do with the Fidelity case. This is a violation and interference with freedom of religion, crimes of harassment and stalking and continued retaliation outside of the workplace.

42.    Financially, Bank of Charles Town employees attempted to foreclose on the Plaintiff mortgage erroneously and when documentation was provided that proved we were completely in compliance with the mortgage and the problem was on their end, they dismissed the incident without any explanation regarding their actions. These actions were reported to Alice Frazier, president of Potomac Bancshares and the WV Attorney General Consumer Division office. At least one of these employees, Tammy Demick is

immediately associated with Jack Shamblin, manager of Defendant EPAA. It should also be noted that Anthony Zelenka, former CEO of WVU-BMC sits on the board of Potomac Bancshares which is the holding company for Bank of Charles Town during the time of these incidents to present day.

Also, in 2019, a physician employed by the hospital, Dr. Romani, approached me during working hours and began reciting specific details of banking transactions and details of a property I had recently bought and was building a house on. The conversations were demeaning in nature stating that I was mortgaging my children's future. I initially did not respond to these comments, but the same conversation continued to occur, to the point I felt my personal information was compromised at my bank. I spoke with CEO Anthony Zelenka, who is a board member of the bank where I hold my mortgage and bank accounts and requested his assistance in checking databases with the bank, WVU-BMC, and speaking with Dr. Romani about how he learned of these details. Eventually Dr. Romani sent me a written apology yet never revealed how he learned of these specific details of my bank accounts and property.

43.    Since 2021, the Plaintiff's wife and the Plaintiff have had six credit card breaches with fraudulent charges in which they have had to close accounts and have companies reissue cards/account numbers. This has negatively affected their credit ratings and in some of these breaches were forced to reach out to the Consumer Financial Protection Bureau for investigation and resolution of the fraudulent charges.

44.    August 2023, The Plaintiff's personal life insurance policy address was changed without authorization and re-routed to an unknown address which has never been a residential or mailing address for the Plaintiff. Michael Fallon, our Nationwide Insurance Agent, was

contacted and he, in turn, called Nationwide headquarters. The representative told him

they received a change of address order. The Plaintiff and his wife inquired of USPS and

submitted a request for investigation of this fraudulent change of address order. Their

investigation showed there was never a change of address order submitted to them.

When the Plaintiff requested the source documents from Michael Fallon and Nationwide

headquarters, they could not produce any change of address order and then stated it was

initiated by a returned mail piece. However, they cannot produce the mail piece which

was returned to them either. The Plaintiff and his wife continue to be told they do not

have the actual mailing envelope with "returned to sender" or "forwarding order" etc.

They only document they have was the letter they had sent out.

The Plaintiff and his wife were told by Lisa Hamilton at Nationwide headquarters that

they use the database Accurint by Lexis-Nexis to come up with client addresses.

Nationwide supposedly has no clue how Accurint obtained and associated this "new"

address with the Plaintiff and never tried to verify it even though the Plaintiff has

multiple policies with the correct address listed on them.  Further, the Plaintiff cannot

make an address change on the account without a proper security vetting by phone yet,

the Plaintiff's address was summarily changed with no documentation to show how, why,

who and what all was changed in this system against all Nationwide policies.

 Michael Fallon was cc'd about this address change, knew our address had not changed,

and never verified the change being made. He says the same process applies to his office,

that someone would have to call from his office and states no one called from his office.

This change of address was meant to interrupt service of the policy, have claims denied

due to incorrect and inconsistent information and/or have the policy cancelled.  This

change allowed for forms to be sent to unknown individuals and potential criminals for use in changing client representation in the account and unknown, unauthorized account changes to be made. When the Plaintiff spoke to the Nationwide representative the day he found out about the address change- the representative was told that the new address was fraudulent and was asked to correct it. However, she sent out a 3rd party designee form to the fraudulent address anyway, which was meant to be sent to the Plaintiff's wife at our specified P.O. Box. This is how easy it is to change client's accounts and cause disruption, denial, and cancellation of protective policies. This is further proof of disruption of financial and asset security. Nationwide representative Lisa Hamilton stated that Accurint reported to them that the database shows our current mailing and residence address as being "closed" which is false and had to have been purposefully changed in the database. Nationwide states they cannot produce any source documents which initiated this change and states we have to go to Lexis-Nexis to request and/or correct their database entries and states it was a Lexis-Nexis issue. Changing addresses for personal information, policies, accounts, and records without proper verification is not only against procedures and protocols for database and record safeguarding but it stated to be the first step for criminals to gain access to accounts, whether through an external or internal criminal breach of the database. The state police have still not done anything even though they have been given evidence and timely submissions of cybercrimes, wire fraud, and identity theft. Michael Fallon, owner of Fallon Insurance Agency is the individual and business involved in the Berkeley County School District illegal breach and dissemination of the Plaintiff wife's personally identifiable information which the WV Department of Education, Berkeley County School District, Berkeley County

Prosecutor's Office,  WV State Police, and  WV Attorney General Office will not investigate any further. It is no coincidence that Mr. Michael Fallon's stepson is a Berkeley County Sheriff Deputy.

45.    The Plaintiff's wife had to alter her remote work schedule and family obligations to apply for employment opportunities offering minimal basic necessities such as, health insurance for their family as this was the during the time the Plaintiff received the "without cause" termination letter from his employer in Covington, VA. The Plaintiff's private data, personal identifiable information have been disseminated illegally throughout these networks and within two weeks of submitting the application and personally identifiable information through a private database in the local Berkeley County School District, the Plaintiff wife's personally identifiable information in this private database was breached and illegally disseminated outside of the school district. The school district, along with the WV Department of Education have obstructed investigation of this matter as evidenced in FOIA documentation, which shows they have omitted key facts and documentation as well as lied to the WV Attorney General's Office and WV State Police. Former WV State Police Colonel Clay Ellwanger is employed by Berkeley County Schools as an internal investigator.  It is shown through emails between Justin Schooley and former BCS Superintendent Patrick Murphy, that Clayton Ellwanger arbitrarily closed the investigation without notifying the Plaintiff's wife. Even though these omissions and falsehoods were made known to the WV Attorney General's Office and the WV State Police, these agencies still refused to investigate any further because of the individuals involved which is public corruption. Information was obtained through an FOIA request of the WV Department of Education and Berkeley County Schools.

Kimberly Croyle of Bowles & Rice law firm represents B.C. Schools in which Justin Schooley, Human Resources Assistant Superintendent was the first individual identified as being involved with the Berkeley County Schools breach of personally identifiable information.

Kim Croyle was emailed by Justin Schooley within 2 hours of Patrick Murphy, former Superintendent of BCS, being notified by the Plaintiff's wife of this breach which took place in August 2021. Justin Schooley already knew who the Plaintiff's wife was and intricate details of her life and relatives, which were never put into this database or relayed to anyone since no one contacted the Plaintiff's wife and she did not tell anyone of this submission including her relatives. Official statements were made to WV Attorney General that no one in the Berkeley County School System knew who she or the Plaintiff were or disseminated her information prior to her making this complaint about the breach.

Justin Schooley obviously knew the Plaintiff's wife immediately with her submission to this database which had her name as well as the Plaintiff's name listed and immediately knew of the sibling relationship without it having been disclosed and denied her employment. Patrick Murphy, former Superintendent of BCS, Kimberly Croyle, Justin Schooley, Clayton Ellwanger (BCS investigator) as well as, Lewis Mullenax, James Butts, Bradley Sponaugle who were the 3 individuals identified by BCS as the only individuals who accessed the PII of the Plaintiff wife, have at best made misrepresentations to the WV State Police and the WV Attorney General. Further, these last 3 individuals did not make this statement until July 2022 when the WV Attorney General finally sent an inquiry to BCS after multiple requests.

When the Plaintiff asked Kimberly Croyle to explain the responses given about this knowledge that Justin Schooley had about the sibling relationship and his attempted intervening of an FOIA request, she deflects by sending the information to Justin Schooley's private legal representation, Tracey Eberling, of Steptoe and Johnson. Kim Croyle was the one initially emailed by Justin Schooley and is BCS representative in these FOIA matters and these are questions for her to answer not Tracey Eberling. Tracey Eberling has no jurisdiction in this matter and does not represent Berkeley County Schools or their FOIA responses. However, Tracey Eberling being cc'd in this matter shows how the civil cases in Berkeley County Circuit Court and all of the obstructions that are taking place in this courthouse. Tracey Eberling should not have been cc'd in this matter whatsoever. Kim Croyle, Bowles and Rice law firm attorney, once caught in misrepresentations of this breach information, refused to answer any more of their requests yet cc'd Tracey Eberling of Steptoe and Johnson law firm, Justin Schooley's private representative in the civil case with William Powell, Scott Ford's representative. Michael Fallon, Fallon Insurance Agency has been at the forefront of many of the breaches and incidents which have occurred.  He was the first to apprise the Plaintiff of the Berkeley County School District database breach in which he named Justin Schooley, Assistant Superintendent of Human Resources of Berkeley County School District as the culprit. He now feigns amnesia of this occurrence and has changed his story multiple times however, Mr. Fallon made sure to make statements to investigating WV State Police Sergeant Nine that Dr. Hall was "paranoid" when Sgt. Nine questioned where he obtained the information and Sgt. Nine chose to purposefully include this in his notes of the investigation to further damage the Plaintiff's credibility and deflect accountability

from Mr. Fallon. This perceived disability narrative is being illegally disseminated to agencies and businesses and is further violation of ADA statutes as well as, federal and state laws and agencies receiving federal funding.

46.    This narrative of "paranoid" was also stated through Anthony Delligatti, legal counsel for Berkeley County Council and Berkeley County Prosecutor Catie Wilkes-Delligatti's husband. Anthony Delligatti referred to the Plaintiff as "paranoid" when he was asked to correct known errors in the county's GIS maps which were being used by 3rd parties, the WV Department of Natural Resources, and individuals. Individuals are continuing to trespass on the Plaintiff's land and using these county assessor maps as an excuse yet, Anthony Delligatti refuses to have the corrections made perpetuating and facilitating this trespassing issue even after the WVDNR requested the same corrections.  There are certified plat surveys with the correct boundaries on file in the county courthouse and he refuses to acknowledge them, refuses to correct the problem, then calls the Plaintiff "paranoid" when the Plaintiff asked him about this issue. These individuals are targeting the Plaintiff's residence, property, and personal safety in violation of Fair Housing Act statutes based on this perceived disability. Anthony Delligatti and his wife, Berkeley County Prosecutor are affiliates with Matthew Harvey, Jefferson County Prosecutor and his wife, Sara Goss-Harvey, CRNA at WVU-BMC as well as, law enforcement personnel, Berkeley County Courthouse personnel, the legal community, federal and state agencies in Berkeley County, WV as well as, local businesses and board members. Their refusal to address known issues not only violates their duties as appointed officials, but federal and state statutes furthering the discrimination and retaliation towards our family.

This is continued retaliation and discrimination outside the workplace and through a state agency receiving federal funding, resulting in further violation of ADA statutes, civil rights, and federal and state laws as well as, violations of the Fair Housing Act.

47.    Former employment personnel affiliated with WVU-BMC individuals involved in this case have played a contributing role in continuation of retaliation through the use of media, doxing, ruination of livelihood, safety threats to the Defendant, Defendant's family and property, trespassing, destruction of property, obstruction of justice in civil cases through individuals with appointed positions, tampering with mail items, wire fraud, breach of accounts and illegal dissemination of personally identifiable information.

48.    By virtue of the continued intentional unlawful discriminatory and retaliatory actions the Plaintiff has suffered harm and injury, including but not limited to

a)    He has lost income, benefits, retirement investments, malpractice coverages, clinical teaching opportunities and growth, and will continue to lose these in the future;

b)    He has been deprived of employee health and welfare benefits, past, present and future;

c)    He has suffered emotional distress, and will continue to suffer distress in the future;

d)    By virtue of the termination of his employment and continued discrimination and retaliation outside the workplace his reemployment opportunities have been interfered with and impaired;

e)    He has suffered injury to his reputation, both inside and outside the workplace;

f)    He has suffered from additional harm, injury, and damages, as may be shown by the evidence; and

g)    He has incurred legal costs and expenses to restore his rights, benefits and protect his licensure and livelihood.

## COUNT ONE

### Disability Discrimination in Violation of the ADA

49.    Plaintiff incorporates the allegations contained in paragraphs 1 through 48 as though they were set forth at length herein.

50.    Defendants are "employers" as defined by the ADA at 42. U.S.C. § 12111(5).

51.    Plaintiff was an "employee" as defined by the ADA at 42 U.S.C. § 12111(4).

52.    Defendants subjected Plaintiff to intentional unlawful discrimination in violation of the ADA, by mandating unlawful evaluations, changing the Plaintiff's job duties and schedule,  wrongfully terminating employment, imposing unlawful employment actions.

53.    As a direct and proximate result of the Defendants unlawful conduct as aforesaid, the Plaintiff has suffered the harm and injury as set forth in Paragraph 48 above.

## COUNT TWO

### Retaliation in Violation of ADA

54.    Plaintiff incorporates the allegations contained in paragraphs 1 through 53 as though they were set forth at length herein.

55.    Plaintiff engaged in conduct protected by the ADA by making known to the employers that the demands for evaluations imposed on the Plaintiff were unlawful and discriminatory and he reserved the right to refuse such evaluations.

56.    Plaintiff believes and avers that the reason for the intentional unlawful discriminatory and retaliatory actions including wrongful termination were motivated, by the Defendants seeking reprisal against him for making patient, personal, flight safety complaints, and

opposing intentional unlawful discriminatory evaluations in violation of the ADA, 42
U.S.C. § 12203.

COUNT THREE

Discrimination in Violation of the West Virginia Human Rights Act

57.   Plaintiff incorporates paragraphs 1 through 56 as though they were set forth at length
      herein.

58.   The actions of the Defendants described above also constitute discrimination in violation
      of the West Virginia Human Rights Act, W.V. Code § 5-11-9.

COUNT FOUR

Retaliation in Violation of the West Virginia Human Rights Act

59.   Plaintiff incorporates paragraphs 1 through 58 as though they were set forth at length
      herein.

60.   The actions of the Defendants described above also constitute retaliation in violation of
      the West Virginia Human Rights Act, W.V. Code § 5-11-9.

COUNT FIVE

Discrimination and Retaliation in Violation of the West Virginia Patient Safety Act

61.   Plaintiff incorporates paragraphs 1 through 60 as though they were set forth at length
      herein.

62.   The actions of the Defendants described above also constitute retaliation in violation of
      the West Virginia Patient Safety Act, W.V. Code § 16-39-4.

## COUNT SIX

### Wrongful Discharge

63. Plaintiff incorporates paragraphs 1 through 62 as though they were set forth at length herein.

64. Termination of the Plaintiff was intended by the Defendants to inflict harm on the Plaintiff's licensure, livelihood, and reputation for making, in good faith, patient safety, personal safety, flight safety complaints and opposing intentional unlawful discriminatory evaluations which is protected activity.

65. As a direct and proximate result of the Defendants' wrongful discharge and continued discrimination and retaliation as aforesaid, the Plaintiff has suffered the harm and injury as set forth in Paragraph 48 above.

66. To the extent that the evidence demonstrates that the conduct of the Defendants in imposing the unlawful discriminatory actions and wrongful termination upon the Plaintiff was malicious, oppressive, wanton, willful, reckless, or manifested a criminal indifference to civil obligations affecting the rights of others, Plaintiff asserts a claim for punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Timothy Hall demands judgement against Defendants for

a. Compensatory damages, statutory damages.

b. Reasonable attorneys' fees and costs; and

c. Such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff Dr. Timothy Hall pro se requests a trial by jury pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Respectfully submitted this 20th day of May 2024.

Timothy Hall, Pro se
P.O. Box 217
Hedgesville, WV 25427
(304) 702-6048